## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

| | | |
|---|---|---|
| **RONALD S. PAQUIN** | § | |
| **Plaintiff** | § | |
| | § | |
| | § | |
| **VS.** | § | **FILE NO.  2:06CV-252** |
| | § | **HON. GORDON J. QUIST** |
| **CONTROL CHIEF CORPORATION** | § | |
| **Defendant** | § | |

_____

Michael H. Hennen                        W. John Stenton (P33467)
PROVOST UMPHREY                     Attorney for Control Chief Corporation
Attorneys for Plaintiff                    1440 West Ridge Street
490 Park Street                              Marquette, MI 49855
Beaumont, Texas 77701                 Telephone:  (906) 226-2524
Telephone: (409) 835-6000

Linda Miller Atkinson (P23345)
Attorneys for Plaintiff
805 Railroad Avenue
Channing, MI 49815
Telephone: (906) 542-6801

_____

## PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT CONTROL CHIEF CORPORATION'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................... ii

INDEX OF EXHIBITS ....................................................................................................... iv

INTRODUCTION ............................................................................................................... 1

STATEMENT OF CORRECTED FACTS ........................................................................... 2

ARGUMENT AND AUTHORITIES ................................................................................. 10

    I.   Summary Judgment Standard .............................................................................. 10

    II.  There is sufficient summary judgment evidence of a product defect. .................... 11

       A.  The control box was defective. ....................................................................... 13

       B.  The defect is attributable to Control Chief. ...................................................... 15

       C.  There is a causal connection between the product defect and Plaintiff's injuries. 16

    III.   Conclusion and Prayer ..................................................................................... 17

i

-

## TABLE OF AUTHORITIES

**Cases**

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970). ........................................................10

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). ..........................................9, 10, 15

*Bouldis v. United States Suzuki Motor Corp.*, 711 F.2d 1319 (6th Cir. 1983). ..................10

*Buenrostro v. Collazo*, 973 F.2d 39 (1st Cir. 1992)...........................................................11

*Caldwell v Fox*, 394 Mich. 401, 231 N.W.2d 46 (1975).....................................................12

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). ................................................................10

*Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146 (6th Cir. 1995)..........................................14

*Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993)......................................................14

*Doe v. Claiborne County, Tenn.*, 103 F.3d 495 (6th Cir. 1996)...........................................14

*Duchon v. Cajon Co.*, 791 F.2d 43 (6th Cir. 1986)............................................................10

*Fleck v. Titan Tire Corp.*, 177 F. Supp. 2d 605 (E.D. Mich. 2001). ...................................11

*Forest Hills Early Learning Cent. v. Lukhard*, 728 F.2d 230 (4th Cir. 1984)......................11

*Gregory v. Cincinnati, Inc.*, 450 Mich. 1, 538 N.W.2d 325 (Mich. 1995). .........................11

*Hollister v. Dayton Hudson Corp.*, 201 F.3d 731 (6th Cir. 2000)......................................11

*Holloway v General Motors Corp*, 403 Mich. 614, 271 N.W.2d 777 (1978).....12, 13, 14, 16

*Kenkel v. The Stanley Works*, 256 Mich. App. 548, 665 N.W.2d 490 (Mich.
    Ct. App. 2003). ........................................................................11, 12, 13, 16

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999)........................................................14

*Lavespere v. Niagra Mach. & Tool Works, Inc.*, 910 F.2d 167 (5th Cir. 1990)..................14

*Lenz v. Erdmann Corp.*, 773 F.2d 62 (6th Cir. 1985).......................................................10

*Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). ....................10

*McLain v. Meier*, 612 F.2d 349 (8th Cir. 1979)................................................................11

*Mulholland v. DEC Int'l Corp.*, 432 Mich. 395, 443 N.W.2d 340 (1989). ...........................14

ii

-

*Phillips v. Cohen*, 400 F.3d 388 (6th Cir. 2005). ...............................................................15

*Piper v. Tensor Corp.*, 71 Mich. App. 658, 248 N.W.2d 659 (Mich. Ct. App. 1976). ..................................................................................................................................13

*Prentis v. Yale Mfg. Co.*, 421 Mich. 670N.W.2d 176 (Mich. 1985)......................................11

*Snider v Bob Thibodeau Ford, Inc,* 42 Mich. App. 708, 202 N.W.2d 727 (1972). .................................................................................................................................12

*Sundberg v. Keller Ladder*, 189 F. Supp. 2d 671 (E.D. Mich. 2002).....................11, 12, 14

*United States v. 14.38 Acres of Land*, 80 F.3d 1074 (5ᵗʰ Cir. 1996). .................................14

*Veillon v. Exploration Servs., Inc.*, 876 F.2d 1197 (5th Cir. 1989)......................................10

*Viterbo v. Dow Chemical Co.*, 826 F.2d 420 (5ᵗʰ Cir. 1987). ..............................................14

*Wheeler v. John Deere Co.*, 935 F.2d 1090 (10th Cir. 1991)..............................................14

**Rules**

Fᴇᴅ R. Eᴠɪᴅ. 702...................................................................................................................14

Fᴇᴅ. R. Cɪᴠ. P. 56. ............................................................................................................9, 10

iii

-

**INDEX OF EXHIBITS**

| **EXHIBIT** | **DESCRIPTION** |
|---|---|
| A | Deposition of Ronald Paquin |
| B | Deposition of Russ Rasnic, P.E. |
| C | C.V. of Russ Rasnic, P.E. (from Rasnic Deposition Exhibit 88) |
| D | Photograph of exemplar switch (Rasnic Deposition Exhibit 79) |
| E | Photograph of north/south switch (Rasnic Deposition Exhibit 80) |
| F | Photograph of north/south switch (Rasnic Deposition Exhibit 81) |
| G | Photograph of exemplar switch (Rasnic Deposition Exhibit 82) |
| H | Photograph of control box (Rasnic Deposition Exhibit 84) |
| I | Photograph of switches in control box (Rasnic Deposition Exhibit 85) |
| J | Deposition of Mark Blau |
| K | Deposition of Al Ogren |
| L | Deposition of Seth Chouinard |

iv

## INTRODUCTION

This is a third-party claim of negligence by Ronald Paquin, an employee of NewPage Corp. (formerly MeadWestvaco), against the Control Chief Corporation, a manufacturer of remote-control devices.  The case arises out of an injury occurring on October 10, 2003 at the then MeadWestvaco paper plant in Wells, Michigan when Ronald Paquin was using a Control Chief remote-control device to move a 15-ton mandrel.  The mandrel moved contrary to the commands given by Mr. Paquin, struck him and caused serious injuries.

Control Chief Corporation manufactured the remote-control device used by Mr. Paquin at the time of his injury, and sold it to Mr. Paquin's employer.  The internal components of the control box were examined by Plaintiff's expert Russ Rasnic, a professional engineer having experience with electronic devices.  Mr. Rasnic performed a forensic analysis and concluded that the internal rotary-switch mechanism that controlled north-south movement had developed contact-welding from arc flashes, which caused the switch points to adhere; leading to the unintended movement.  Plaintiff's evidence shows the Control Chief remote-control device was defective and that the defect caused Mr. Paquin's injuries.  Defendant's experts, on the other hand, claim that contact welding could not have occurred.  Defendant has not challenged the admissibility of Mr. Rasnic's opinions under Rule 702.  Instead, it asks the Court to disbelieve the Plaintiff and disbelieve Mr. Rasnic and to give conclusive weight to its own experts' opinions.  Because the Court is not permitted to weigh the evidence on summary judgment, Defendant's motion should be denied.

1

-

**STATEMENT OF CORRECTED FACTS**

## Description of the Accident

Plaintiff Ronald Paquin was maneuvering a 15-ton mandrel by means of an overhead crane controlled by a Control Chief remote-control device from where the mandrel was sitting on the floor with the intention of moving it to a location further east in the plant.[1] Mr. Paquin used the "hoist," or up-down lever, at the slowest speed to raise the mandrel about 18 inches off the floor; then stopped it.  Mr. Paquin engaged the north/south lever and moved the mandrel a short distance to the north on the slowest setting.  He then released the lever.[2] The lever is spring-loaded and is supposed to return to neutral when released.[3]

A couple seconds after releasing the north/south lever, Mr. Paquin engaged the east/west lever and began moving the load east, and turned so that he was facing the direction the mandrel was moving rather than facing the mandrel itself.[4] To his north was a solid wall approximately four feet high.[5]

Mr. Paquin did not realize that the mandrel was moving toward him until it actually struck him.[6] The mandrel then swung back and hit him a second time.[7] Mr. Paquin was seriously injured as a result.[8] After the mandrel struck him a second time, he dropped to the floor and the load swung over him.[9]

Crane technician Seth Chouinard was called to the scene shortly after the accident. He obtained a different control box for the overhead crane and confirmed that the crane

---

[1] *See* Defendant's Exhibit C.
[2] Exhibit A at 186.
[3] Exhibit A at 186.
[4] Exhibit A at 189, 229.
[5] *See* Defendant's Exhibit C.
[6] Exhibit A at 198-199.
[7] Exhibit A at 201.
[8] Exhibit A at 280-286.

2

itself was operating properly.[10]  He explained: "Apparently they thought the radio controls didn't work properly.  So I ran it from the floor and then I went up on top of the crane and ran it and checked out the controls and all the drives and everything checked out fine."[11] Mr. Chouinard could not test the box that Mr. Paquin had been using, but he tested everything else and verified that the crane portion was working properly.[12]

Mr. Paquin was quite certain that was only using one lever at a time and that he was not touching the north/south at the time he was struck and that the crane failed to respond to orders that it stop.[13]  Mr. Paquin testified that the machinery malfunctioned and that the mandrel moved to the north improperly.[14]

**The Control Box - Maintenance**

Defendant states that maintenance was done in house at the paper mill, but neglects to mention the fact that that maintenance consisted of swapping out one Control Chief part for another Control Chief part.  Mark Blau a technician in the Electrical and Instrumentation department testified that, apart from replacing inexpensive items like fuses and the like on expensive boards, the type of maintenance they did was basically replacing old parts with new parts.[15]  Furthermore, he testified that maintenance is done with parts obtained from Control Chief.[16]  Mr. Blau testified that "most of the switches are just plug-in type of thing, too.  We don't do any wiring.  That literally just plugs into the

---

[9] Exhibit A at 208.

[10] Exhibit L at 21-22.

[11] Exhibit L at 22.

[12] Exhibit L at 23.

[13] Exhibit A at 255-256.

[14] Exhibit A at108-109.

[15] Exhibit J at 24-27.

[16] Exhibit J at 22.

boards and they work,"[17] and "when we change out a component, it's with a like kind of replacement part for it.  So we don't do any modifications to it."[18]

Furthermore, Defendant's claims about repairs allegedly made to the E5804-1 control box are not supported by its summary judgment evidence.  For instance, Defendant asserts that "in 2001, it was reported that the north/south trolley was not working and it was repaired."  In fact, the maintenance log shows that that entry applied to the E6352-1 control box, not the E5804-1 box at issue in this case (and even there the problem was a blown fuse rather than a problem with the switch).[19]  Moreover, the logs do not show any repair to any component that could even potentially have caused the malfunction between the time Control Chief delivered the box in 2000 and Mr. Paquin's accident in December of 2003.[20]

## The Control Box – Chain of Custody After the Accident

Defendant makes much of the fact that "several people touched the box and transported the box before Control Chief was notified of the accident," apparently on the theory that because the battery and main processor had been removed, someone might also have replaced or interchanged the switches.  When Defendant's counsel asked Mr. Rasnic whether it was possible that the control switches were removed and interchanged, he correctly replied: "There's no testimony to that."[21]

The actual testimony was that the battery would have been removed immediately after the accident for safety purposes.  Al Ogren, another electrical technician, said that, for safety reasons: "The first thing we would ever do with a damaged box is pull out the

---

[17] Exhibit J at 14.
[18] Exhibit J at 38.
[19] *See* Defendant's Exhibit H at 10.
[20] *See* Defendant's Exhibit H at 2.
[21] Exhibit B at 97.

battery."[22]  As for the processor, while it was not known who removed it, both Mr. Blau and Mr. Ogren suggested that the only reason for removing the processor would be to make sure the new box was set up correctly so the new box would work with the crane on the correct frequency.[23]

Furthermore, both Mr. Blau's and Mr. Ogren's testimony strongly suggests that nothing else would have been done with the internals of the box.  Mr. Blau said no testing was done and, upon seeing the damage, "it was a pretty short evaluation after seeing that that we weren't going to try firing it up or pulling it up and testing it."[24]  When asked whether they tested the internal components, Mr. Ogren said, "we just looked at the stuff to see if it looked like it was in proper order.  I don't believe we put any meters on it to check things like that."[25]

**Mr. Rasnic's Testimony**

Russ Rasnic provided a forensic analysis of the equipment involved in Mr. Paquin's accident.  Mr. Rasnic is a registered professional engineer and the director of Ryan Engineering, Inc.'s forensic division that handles litigation testimony.[26]  Mr. Rasnic is educated in the principles of mechanical engineering, having received both his bachelor's and master's degrees in mechanical engineering from the University of Arkansas.[27]  Mr. Rasnic has more than 20 years of design experience in the field of mechanical engineering and has worked on electrical circuit design or electrical engineering for most of his career, including work as a circuit designer for Texas Instruments and ROL-LIFT

---

[22] Exhibit K at 21-22.

[23] Exhibit J at 34; Exhibit K at 22, 35-36.

[24] Exhibit J at 8.

[25] Exhibit K at 11.

[26] Exhibit B at 33-34; Exhibit C.

[27] Exhibit B at 27-28.

Corporation.[28]   Mr. Rasnic used switches like the switch at issue in this case during his design career.[29] As a litigation consultant, Mr. Rasnic has worked on a variety of cases and has been qualified to testify as an expert in a number of cases involving mechanical and electromechanical issues, including at least one case involving issues just like this one.[30]

Mr. Rasnic knew that Mr. Paquin had released the north/south control switch based on Mr. Paquin's testimony.[31]  From there, Mr. Rasnic examined possible explanations for the north/south travel.  He ruled out the possibility that another control box was in use based on the fact that Mr. Paquin said that the lights on the bridge of the crane indicated that only one control box was active and there was no evidence that another control box was in use.[32]  He ruled out the possibility that the switch was mechanically inhibited from returning to the neutral because his examination of the box showed no evidence of scraping on the sides of the lever or any other evidence of mechanical interference with the lever.[33]  He ruled out electrical problems in the crane based on inspections carried out immediately after the accident that showed that the crane was functioning properly.[34]

The remaining possibility, and the one Mr. Rasnic determined was the most likely, is that that the contact pads on the north/south rotary switch in the control box welded to the contact arm, which would keep the trolley moving in the north/south direction even after the switch was released.[35]  Mr. Rasnic said that the most likely scenario was that the contact pads on the north/south rotary switch in the control box welded to the contact arm,

---

[28] Exhibit B at 29-36.

[29] Exhibit B at 41

[30] Exhibit B at 43, 45-46.

[31] Exhibit B at 111.

[32] Exhibit B at 114.

[33] Exhibit B at115-116, 120-122.

[34] Exhibit B at 122-126.

[35] Exhibit B at 126.

which would keep the trolley moving in the north/south direction even after the switch was released.[36]   He reached that conclusion after eliminating all the other possibilities based on the evidence he saw.[37]

Mr. Rasnic explained that contact welding occurs when you get an arc flash from an engagement and a disengagement of the contact and that it can be caused by such things as low battery voltage (which increases the amperage and intensity of the arc), pitting, dirt, and wear of the contacts.[38]   In this case, Mr. Rasnic observed evidence of metal wear on the contacts.[39]   Mr. Rasnic said that he had seen contact welding "happen in lots of switches, especially in DC circuits."[40]

Mr. Rasnic further explained that at its lowest speed setting, there is minimal counteracting force from the spring on the order of two pounds measured at 1.5 inches from the pivot that would serve to pull the contacts apart if they became welded.  He said contact welding is a well known phenomenon with DC current contactors, and there was forensic evidence that welding did occur on the first contact pad in the proper direction on the north/south switch.[41]

The forensic evidence to which Mr. Rasnic referred included a burned area on the switch that indicated that arcing had occurred, and damage to the contacts indicating that a contact weld had occurred.[42]   Mr. Rasnic disagreed with Defendant's witnesses' assertion that the marks were simply oxidation: "I don't think that kind of damage is caused by oxidation.  I think it's caused by arc flash."[43]   He said, "my opinion is that those are burn

---

[36] Exhibit B at 107-108, 110-111.

[37] Exhibit B at 149.

[38] Exhibit B at 127, 134.

[39] Exhibit B at 128.

[40] Exhibit B at 134.

[41] Exhibit B at 108, 110-111, 127.

[42] See Exhibit B at 108, 110-111, 127-139.

[43] Exhibit B at 136.

marks, because I have investigated lots of contactor weld cases when I was a machine designer, and they look the same.[44]

Mr. Rasnic further stated:

If you look at the Exhibit 80, you can see some metal removed on the left side of the left contact pad.  That, in my opinion, is where the weld occurred.

Or, right down below that, there is an indentation kind of perpendicular to the photo that also looks like metal missing as a part of the contact pad.[45]

*   *   *

The Exhibit 81 is just a different angle where you can see some of the metal removed on the left. And for that matter, most of them have at the point where the wiper contacts them in that direction, they have metal removed.[46]

Mr. Rasnic provided a forensic analysis based on his examination of the switches:[47]

"I'm not commenting on the amount of voltage and the number of amps it takes to do a contact weld.  I don't know how many amps it takes to make the contact weld.  All I'm going on is the evidence that shows that there was welding there."[48]

## Defendant's Experts

Control Chief relies on the affidavits of two experts—William Kimmel[49] and John Lauhoff[50]—who assert, based on their review of photographs, that the burn marks, metal wear, and the metal removed from the contact pad that Mr. Rasnic observed when he personally examined the switch[51] were not really there.  They then go on to state in a conclusory fashion that arc flashing cannot occur at the voltage at which the switch was

---

[44] Exhibit B at 137-138.

[45] Exhibit B at 137.  Rasnic's deposition Exhibit 80 is included as Exhibit E.

[46] Exhibit B at 139.  Rasnic's deposition Exhibit 81 is included as Exhibit F.

[47] Exhibit B at142.

[48] Exhibit B at140.

[49] Defendant's Exhibit R.

[50] Defendant's Exhibit S.

[51] *See* Exhibit B at 136-138.

supposed to operate in the case Lauhoff,[52] or the alleged amperage, in the case of Kimmel.[53]

According to Lauhoff, "[t]here is no uneven surface on the switch to demonstrate a contact weld,"[54] and Kimmel claims, "the visual inspection of the contacts revealed no abnormality."[55]  And yet, Mr. Rasnic actually observed an unevenness or abnormality on the switch pads in the form of missing metal.[56]

Defendant's corporate representative, David Higgs asserts that a weld could not occur with that circuit. Higgs said, "our position it that there is no possible way in which the contract on that switch can weld due to the lack of sufficient energy in those circuits."[57]  Higgs could not say how many amps would be required to cause a welding to occur, stating instead "it just can't happen with this circuit."[58]  And like Defendant's experts, Higgs attributed the discoloration on the contacts to natural oxidation, but gives no basis for that opinion.[59]  There is no indication that Higgs did any testing or chemical analysis or anything other than look at the contacts, and Defendant's experts' affidavits indicate that they did nothing more than look at pictures.

---

[52] *See* Defendant's Exhibit S at 4.

[53] See Defendant's Exhibit R at 4.

[54] Defendant's Exhibit S at ¶5.

[55] Defendant's Exhibit R at ¶8.

[56] Exhibit B at 137.  Rasnic's deposition Exhibit 80 is included as Exhibit E.

[57] Defendant's Exhibit N at 41

[58] Defendant's Exhibit N at 41.

[59] *See* Defendant's Exhibit N at 33, 44.

## ARGUMENT AND AUTHORITIES

**I.    SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  The Supreme Court has interpreted this to mean that summary judgment should be entered if the evidence is such that a reasonable jury could find only for the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. The moving party has "the burden of showing the absence of a genuine issue as to any material fact." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Lenz v. Erdmann Corp.*, 773 F.2d 62 (6th Cir. 1985).  A summary judgment movant "always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the movant meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). To demonstrate a genuine issue, the non-movant must present sufficient evidence upon which a jury could reasonably find for the non-movant. *Liberty Lobby*, 477 U.S. at 252.   In resolving a summary judgment motion, the Court must view the evidence in the light most favorable to the non-moving party. *See Duchon v. Cajon Co.*, 791 F.2d 43, 46 (6th Cir. 1986); *Bouldis v. United States*

10

*Suzuki Motor Corp.*, 711 F.2d 1319 (6th Cir. 1983).  The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *Liberty Lobby*, 477 U.S. at 255.

Finally, except, perhaps, when the issue concerns qualified immunity, "[a] district judge has the discretion to deny a Rule 56 motion even if the movant otherwise successfully carries its burden of proof if the judge has doubt as to the wisdom of terminating the case before a full trial." *Veillon v. Exploration Servs., Inc.*, 876 F.2d 1197, 1200 (5th Cir. 1989) (citations omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255 ("Neither do we suggest that the trial courts should act other than with caution in granting summary judgment or that the trial court may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial."); *Buenrostro v. Collazo*, 973 F.2d 39, 42 n.2 (1st Cir. 1992); *Forest Hills Early Learning Cent. v. Lukhard*, 728 F.2d 230, 245 (4th Cir. 1984); *McLain v. Meier*, 612 F.2d 349, 356 (8th Cir. 1979);10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE & PROCEDURE § 2728.

## II.    THERE IS SUFFICIENT SUMMARY JUDGMENT EVIDENCE OF A PRODUCT DEFECT.

"Traditional principles of products liability law recognize three types of defects: manufacturing defects, defects due to faulty design, and defects due to inadequate instructions or warnings." *Fleck v. Titan Tire Corp.*, 177 F. Supp. 2d 605, 613 (E.D. Mich. 2001)  "To provide compensation for injuries caused by such defects, Michigan recognizes two distinct causes of action for product failures: negligence and implied warranty." *Id.* (citing *Gregory v. Cincinnati, Inc.*, 450 Mich. 1, 538 N.W.2d 325, 329 (Mich. 1995); *Hollister v. Dayton Hudson Corp.*, 201 F.3d 731, 736-737 (6th Cir. 2000)).[60] The Michigan

---

[60] Defendant contends that *Hollister* stands for the proposition that an implied warranty and negligence claim are essentially identical.  This contention was examined and debunked in *Sundberg v. Keller Ladder*, 189 F. Supp. 2d 671, 677 (E.D. Mich. 2002) ("Although the language cited by the defendants is quite sweeping,

11

Supreme Court has recognized "that the negligence theory generally focuses on the defendant's conduct, requiring a showing that it was unreasonable." *Prentis v. Yale Mfg. Co.*, 421 Mich. 670, 365 N.W.2d 176 (Mich. 1985). Conversely, the implied warranty cause of action "generally focuses upon the fitness of the product, irrespective of the defendant's conduct." *Id.* Thus, "[i]n a claim of breach of implied warranty, the product's lack of fitness for its intended use amounts to an actionable defect." *Kenkel v. Stanley Works*, 256 Mich. App. 548, 665 N.W.2d 490 (Mich. Ct. App. 2003) (footnote and citation omitted).  A plaintiff seeking recovery on a breach-of-warranty claim must prove that there was a defect attributable to the manufacturer, and a causal connection between that defect and the injury or damage. *Id.* at 556-557. It is not necessary to prove that the manufacturer failed to exercise due care.  *Id.* at 557. A demonstrable malfunction is generally clear evidence of a defect, and it is within the province of the jury to infer the existence of a defect from circumstantial evidence alone. *Id.* at 558.  Finally, in *Kenkel*, the court further observed:

> [A] plaintiff pursuing a claim of breach of implied warranty is not required to identify the precise defect in the product unless there are multiple actors to whom a malfunction could be attributed. [7] *Caldwell v Fox*, 394 Mich. 401, 410; 231 N.W.2d 46 (1975); *Snider v Bob Thibodeau Ford, Inc,* 42 Mich. App. 708, 713; 202 N.W.2d 727 (1972);  *Sundberg v Keller Ladder,* 189 F. Supp. 2d 671, 676 (ED Mich, 2002) (decided pursuant to Michigan law). Furthermore, the plaintiff is not required to demonstrate whether the defect was caused by "design, material, assembly or a combination...." *Holloway v General Motors Corp*, 403 Mich. 614, 626; 271 N.W.2d 777 (1978). "It is the injury inflicted on the plaintiff that entitles him to a remedy, not his skill in discovering precisely where defendant's manufacturing process went wrong." *Id.*

*Kenkel*, 256 Mich. App. at 557-58.

Similarly, in *Sundberg v. Keller Ladder*, the court stated:

---

probably overly so, the defendants must recall that the precise questions in this case -- whether an implied warranty defect need be specified and whether implied warranty claims always require proof of negligence -- were not before the *Hollister* Court.")  Furthermore, the Michigan Court of Appeals recently held that "plaintiff's concession that the product was neither negligently designed nor negligently manufactured is not fatal to her claim of breach of implied warranty." *Kenkel v. The Stanley Works*, 256 Mich. App. 548, 556, 665 N.W.2d 490, 496 (Mich. Ct. App. 2003).

[E]ven if none of the three types of "defects" (i.e., design, manufacture or warning) could support the jury's finding, the jury could still have found that the product failed to function adequately for its foreseeable use. In other words, even if the defect could have been cabined into a manufacturing, design or information defect, it could also be generally described merely as the product's failure to perform adequately for its intended use.

It is apparent that Michigan law defining products liability causes of action for breach of warranty does not require the plaintiff to plead and prove a specific defect, and that the failure of the product to perform as represented or in a manner reasonably consistent with its intended and foreseeable use will support such a claim.

*Sundberg*, 189 F. Supp. 2d at 678.

"It is the injury inflicted on the plaintiff that entitles him to a remedy, not his skill in discovering precisely where defendant's manufacturing process went wrong." *Holloway*, 403 Mich. at 626.

Defendant makes two arguments that might potentially be applicable to product-defect claim based on an implied warranty (which are also the only arguments Defendant makes against a negligence-based manufacturing defect claim) – that the remote-control device was not defective and that the defect cannot be attributed to Control Chief.

### A. The control box was defective.

#### 1. Plaintiff's testimony alone is sufficient to prove a product defect.

Under Michigan law, the plaintiff's testimony alone may be enough to establish a product defect. *See Kenkel*, 256 Mich. App. at 558 ("Although the testimony of other witnesses may have been helpful to corroborate plaintiff's testimony, corroboration was unnecessary because plaintiff's testimony was sufficient to create a question of fact regarding whether the doors malfunctioned and closed on her.")

"A demonstrable malfunction is generally clear evidence of a defect...." Additionally, "it is within the province of the jury to infer the existence of a defective condition from circumstantial evidence alone...."

*Id*, 256 Mich. App. at 558 (citations omitted); *see also Piper v. Tensor Corp.*, 71 Mich. App. 658, 661, 248 N.W.2d 659, 660 (Mich. Ct. App. 1976) ("a product may be found defective

from circumstantial evidence without a specific showing of a demonstrable defect."). In this case, Mr. Paquin's testimony establishes that the control box malfunctioned. Although he released the north/south lever, the mandrel continued to move north.

**2.      It is enough to establish a logical sequence of cause and effect.**

The plaintiff is not required to eliminate all possible alternate causes of accident, even when other plausible theories have some evidentiary support. Rather, under Michigan law, a plaintiff need only provide a logical sequence of cause and effect from which a reasonable jury could infer a defective product. *Sundberg*, 189 F. Supp. 2d at 680; *Mulholland v. DEC Int'l Corp.*, 432 Mich. 395, 415, 443 N.W.2d 340 (1989). With Mr. Rasnic's testimony, Plaintiff has done this. Mr. Rasnic provided a logical basis for his conclusion that arcing and a contact weld occurred, as well as a logical basis for ruling out other potential causes.

**3.      Questions of comparable probability are to be resolved by the trier of fact.**

"Questions of comparative probability are to be resolved by the trier of fact." *Mulholland*, 432 Mich. at 415 (citing *Holloway*, 403 Mich. at 622). Federal procedural law is no more stringent. *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 151-152 (6th Cir. 1995); *Doe v. Claiborne County, Tenn.*, 103 F.3d 495, 505 (6th Cir. 1996)([A] party may rely upon circumstantial and inferential evidence to defeat a… summary judgment motion."); *Sundberg*, 189 F. Supp. 2d at 680.

In this case, Mr. Rasnic testified, based on a forensic analysis of the switches, that the control box malfunctioned as a result of a contact weld. He provided a legitimate basis for his opinions from his forensic analysis of the switch and his ruling out of other potential causes. His opinions are not merely conclusory, and Defendant has not lodged a Rule

702 objection to his testimony.[61]   Defendant might prefer that the Court credit its experts over Mr. Rasnic, but that is not something the Court is permitted to do on summary judgment.  "[C]ompeting expert opinions present the 'classic battle of the experts' and it [is] up to a jury to evaluate what weight and credibility each expert opinion deserves." *Phillips v. Cohen*, 400 F.3d 388, 399 (6th Cir. 2005) (internal quotation omitted) (alteration in original). At the summary judgment stage of a case, the district court should not weigh the evidence or judge the credibility of witnesses. *See Anderson v. Liberty Lobby*, 477 U.S. at 255 (holding that "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he is ruling on a motion for summary judgment").

### B.    The defect is attributable to Control Chief.

Defendant asserts that it cannot be held responsible for the defect in the control box because maintenance was performed by the mill.   However, Control Chief's own summary judgment evidence demonstrates that there were no repairs to any component of the control box involved in this case that could even potentially have caused the malfunction between the time Control Chief delivered the box in 2000 and Mr. Paquin's accident in December of 2003. [62]   Furthermore, Mark Blau's testimony shows that when

---

[61] Even if Defendant had timely raised a *Daubert* objection to Mr. Rasnic testimony, it would have to be overruled.  Mr. Rasnic is clearly qualified to render opinions on engineering and forensic analysis.  It is well established that an engineer is not strictly confined to his are of practice, but may testify about related applications.  *See Wheeler v. John Deere Co.*, 935 F.2d 1090, 1100-01 (10th Cir. 1991); *Lavespere v. Niagra Mach. & Tool Works, Inc.*, 910 F.2d 167, 176-77 (5th Cir. 1990).  With regard to the substance of Mr. Rasnic's opinions, the objective of the gatekeeping function "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).  There is no indication that Mr. Rasnic has departed from appropriate standards of forensic analysis in this case.  As general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration."  *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996) (*quoting Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir. 1987)).  And while Defendant may prefer its own expert's opinions to Mr. Rasnic's, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional, and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 596 (1993).

[62] *See* Defendant's Exhibit H at 2.

repairs were made, the mill's technicians merely replaced one Control Chief part with another, without making any modifications to the components.[63]   Mr. Blau testified that "most of the switches are just plug-in type of thing, too.   We don't do any wiring.   That literally just plugs into the boards and they work,"[64] and "when we change out a component, it's with a like kind of replacement part for it.   So we don't do any modifications to it."[65]

"Where a failure is caused by a defect in a relatively inaccessible part integral to the structure of the [product] not generally required to be repaired, replaced or maintained, it may be reasonable, absent misuse, to infer that the defect is attributable to the manufacturer."   *Holloway*, 403 Mich. at 624; *Kenkel*, 256 Mich. App. at 559.   In this case, the evidence shows that the internal parts of the control box relevant to Plaintiff's claim were not generally required to be "repaired, replaced, or maintained."

### C.   There is a causal connection between the product defect and Plaintiff's injuries.

Defendant denies that there is a causal connection between the product defect and Plaintiff's injury, but the argument is based entirely on Defendant's assertion that the control box did not malfunction.   The evidence shows that Defendant's product malfunctioned and that that malfunction resulted in Mr. Paquin being crushed by the mandrel. [66]

---

[63] Exhibit J at 22, 24-27.

[64] Exhibit J at 14.

[65] Exhibit J at 38.

[66] *See* Exhibit A at 280-286

III.    CONCLUSION AND PRAYER

Genuine issues of material fact are evident in the testimony of Plaintiff, the findings and opinions of Plaintiff's expert as opposed to the affidavits and assertions of Defendant's experts as to whether or not a malfunction occurred in the remote-control box switch.

For all the foregoing reasons, Plaintiff respectfully requests that the Court deny Control Chief Corporation's motion for summary judgment, and that Plaintiff be afforded all other relief to which he may be entitled.

Dated this 21st day of November, 2008.

PROVOST UMPHREY LAW FIRM, LLP

  /s/ Michael H. Hennen
Michael H. Hennen
490 Park Street
Beaumont, TX  77701
409-835-6000 telephone
409-813-8615 facsimile
Attorneys for Plaintiff

17

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

**CERTIFICATE OF SERVICE**

A true and correct copy of PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT CONTROL CHIEF CORPORATION'S MOTION FOR SUMMARY JUDGMENT was served on counsel of record, listed above, on November 21, 2008, by electronic means and will be served on November 24, 2008 by certified mail, return receipt requested.

Respectfully submitted,

PROVOST UMPHREY, L.L.P.

/s/ Michael H. Hennen
Michael H. Hennen, Attorney in Charge
490 Park Street
Beaumont, Texas 77701
(409) 835-6000 Phone
(409)813-8615 Fax
Email: mhennen@pulf.com
ATTORNEYS FOR PLAINTIFF

18